BLAIR C. PEREZ
Attorney for the United States
Acting Under Authority Conferred by 28 U.S.C. § 515
PHILIP L.B. HALPERN, CASB 133370
MARK W. PLETCHER, Colorado State Bar No. 034615
HELEN H. HONG, CASB 235635
BILLY JOE MCLAIN, CASB 290682
Assistant U.S. Attorneys
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-6990
Email: helen.hong@usdoj.gov

Attorneys for the United States

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>    v.<br><br>JOSE SUSUMO AZANO MATSURA (1),<br>      aka Mr. A.,<br>      aka Mr. Lambo,<br>RAVNEET SINGH (2),<br>      aka Ravi Singh,<br>MARCO POLO CORTES (4),<br>EDWARD SUSUMO AZANO HESTER (5),<br>      aka Susu,<br>      aka Junior,<br><br>              Defendants. | Case No.: 14-CR-0388-MMA<br><br>**UNITED STATES'S OPPOSITION TO SINGH'S MOTION FOR JUDGMENT OF ACQUITTAL [631-1]** |

    A rational jury could—and did—find that Singh conspired to willfully violate federal election laws and to knowingly falsify campaign finance records in order to impede a federal investigation. Indeed, the jury convicted Singh of all four counts he faced at trial. For the reasons this Court denied Singh's Rule 29 motion at the close of the government's case (and at the conclusion of all evidence), RT 8/24/16 [426, 431 (denying Rule 29 arguments by all defendants)], Singh's renewed motion for judgment of acquittal [631-1] should be denied.

    In considering a challenge to the sufficiency of evidence, this Court must "view the evidence in the light most favorable to the prosecution." *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010). That means that "when faced with a record of

conflicting inferences, a reviewing court must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* (internal quotations omitted).

This Court then determines whether the evidence, so viewed, "is adequate to allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *Id.* That does not mean a reviewing court asks "itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt, . . . only whether any rational trier of fact could have made that finding." *Id.* To prevail on a Rule 29 motion, the defendant bears a "heavy burden." *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011). And even in a "close case, where either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *United States v. Temple*, 447 F.3d 130, 137 (2d Cir. 2006).

## I.   COUNT 1: CONSPIRACY

The evidence introduced at trial exceeded the minimum required to defeat Singh's Rule 29 motion. Singh's principal challenge to the conspiracy count is the sufficiency of evidence to establish a single conspiracy, rather than multiple conspiracies: "Even giving the government the benefit of the doubt and assuming that the evidence did show that Mr. Singh and Mr. Azano conspired with respect to ElectionMall's work on the Dumanis and Filner campaigns," Singh argues that "the government introduced no evidence that Mr. Singh knew or had reason to know that other co-conspirators such as Jason Wolter or Marc Chase were involved, or that political contributions to Congressman Juan Vargas were contemplated. The government introduced no evidence that the benefits that Mr. Singh may have received from the conspiracy were in any way dependent on the success of the entire venture." . Mot. [631-1] at 6.

Not so. The jury appropriately rejected Singh's interpretation of the evidence, finding one overall conspiracy that was agreed-upon by the participants. See Jury Instr.

21 (multiple conspiracy instruction). "To prove a conspiracy under 18 U.S.C. § 371, the government must first establish: (1) an agreement to engage in criminal activity, (2) one or more overt acts taken to implement the agreement, and (3) the requisite intent to commit the substantive crime." *United States v. Grasso*, 724 F.3d 1077, 1086 (9th Cir. 2013). Although the government must show some actual meeting of minds between the coconspirators, it may do so "through circumstantial evidence that defendants acted together in pursuit of a common illegal goal." *United States v. Grovo*, 826 F.3d 1207, 1216 (9th Cir. 2016). "A formal agreement is not necessary; rather the agreement may be inferred from the defendants' acts pursuant to the scheme, or other circumstantial evidence." *Id.* Coordination between conspirators, for example, "is strong circumstantial proof of agreement." *United States v. Iriarte-Ortega*, 113 F.3d 1022, 1024 (9th Cir. 1997).

To establish the existence of a single conspiracy, rather than multiple conspiracies, the government must prove that an overall agreement existed among the conspirators. *United States v. Bibbero*, 749 F.2d 581, 587 (9th Cir. 1984). But a single conspiracy may involve several "sub-agreements or sub-groups of conspirators." *Id.* In distinguishing single vs. multiple conspiracies, courts consider "the nature of the scheme; the identity of the participants; the quality, frequency, and duration of each conspirator's transactions; and the commonality of time and goals." *Id.*

> A single conspiracy can only be demonstrated by proof that an overall agreement existed among the conspirators. Furthermore, the evidence must show that each defendant knew, or had reason to know, that his benefits were probably dependent upon the success of the entire operation. Typically, the inference of an overall agreement is drawn from proof of a single objective . . . or from proof that the key participants and the method of operation remained constant throughout the conspiracy. The inference that a defendant had reason to believe that his benefits were dependent upon the success of the entire venture may be drawn from proof that the coconspirators knew of each other's participation or actually benefitted from the activities of his coconspirators.

*United States v. Fernandez*, 388 F.3d 1199, 1226 (9th Cir. 2004), modified, 425 F.3d 1248 (9th Cir. 2005). "The evidence need not be such that it excludes every hypothesis

but that of a single conspiracy; rather, it is enough that the evidence adequately supports a finding that a single conspiracy exists." *United States v. Kenny*, 645 F.2d 1323, 1335 (9th Cir. 1981).

### a. The Nature of The Scheme, And Quality, Frequency, and Duration of Each Conspirator's Transactions.

The evidence was sufficient for a rational jury to infer "an overall agreement" because of "proof of a single objective." The scheme, by its nature, had one overarching goal: inject illegal funds to help install politicians favorably disposed to Azano's business ventures. Azano stood at the hub of the conspiracy; he was not interested in donating for the sake of donating or particularly wedded to any candidate (as his backing of Dumanis first and Filner next would reflect). The conspiracy members understood that their unified efforts to inject foreign money into campaigns supported one aim: the goal of *electing* Azano's chosen politicians and gaining Azano political influence. See *United States v. Otis*, 127 F.3d 829, 835 (9th Cir. 1997) ("one overall agreement to perform various functions to achieve the objectives of the conspiracy"); *United States v. Taren-Palma*, 997 F.2d 525, 530 (9th Cir. 1993) ("Finding multiple conspiracies requires some evidence of separate agreements and purposes.").

The jury repeatedly heard that the overarching goal was to elect politicians to "help [Azano] get[] the things he needed to get done," like "real estate development." RT 8/2/2016 (testimony of Jason Wolter) at 38:22-25; see also RT 8/2/2016 (Testimony of Brian Duarte) at 29:16-24 ("Wolter told me that if Bonnie Dumanis was to be elected that she would help pave the way for Azano to build a high-end resort in and around downtown San Diego somewhere along the waterfront or so and that she would help cut the red tape and push through permits and the correct zoning area, and I'm sure there's coastal commission issues with buildings downtown that have to be put through the city. So from what Wolter told me, she told Azano she would help expedite that process."); RT 7/29/16 (Testimony of Diego Duque) at 187:18-188:7 (testifying that Azano's son had promised to reimburse straw donors to Dumanis campaign, which would support a family project). As one witness summarized, "Azano was interested in

having a friend in the mayor's office and influence." RT 8/11/16 (testimony of Clancy) at 45:23-24. And that singular objective rationally supports the inference of a single conspiracy. *Fernandez*, 388 F.3d at 1226.

The "method of operation" to achieve that goal remained constant: the conspirators deposited Azano's money, but concealed his identify as the source of the funds. Although some conspirators achieved that through solicitation of individual straw donors (Hester, Chase, for example), or through large straw donations (Chase, Airsam), or as in Singh's case through in-kind services funded by Azano, the efforts to conceal in each were the same. In each instance, the conspirators concealed the true source of the funds for a donation, in order to evade prohibitions designed to prevent foreign meddling in United States elections—Azano's money, but always someone else's name. *Fernandez*, 388 F.3d at 1226 (proof of single conspiracy from "the evidence of a generalized, coherent and consistent scheme"). That "common modus operandi" provided adequate evidence for a rational jury to find the existence of one common scheme. *United States v. Disla*, 805 F.2d 1340, 1349 (9th Cir. 1986) (proof of single conspiracy in part because conspirators used "a common modus operandi (covering up the identity of the participants by use of aliases, i.e., "Cuto," "Angel Garcia," and preventing the tracing of participants by use of the "blue box" and by individual participants using different addresses)").

In any event, a rational jury could find that the different means of injecting Azano's money into elections (straw donations to PACs, for example) was within the scope of Singh's knowledge and agreement. For example, Singh himself corresponded with Encinas about Azano's effort to "form a PAC[,]" which had "nothing to do with the website work" and in-kind donations that Singh himself conducted. GEX 48-2. Singh refused to discuss PACs with Encinas over email "[b]ecause of the legal ramifications." *Id.* This reference to a PAC offered the jury a rational basis to conclude that Singh understood that other members of the conspiracy pursued different means of achieving their common objective. But this evidence is not even necessary to establish

Singh's culpability for joining the single conspiracy in this case. After all, "[i]t need not even be shown that an alleged co-conspirator knew all of the purposes of and all of the participants in the conspiracy." *United States v. Kearney*, 560 F.2d 1358, 1362 (9th Cir. 1977).

### b. The Commonality of Time and Goals.

The acts of the conspirators enjoyed "commonality of time," as well. *Bibbero*, 749 F.2d at 587. This was not a case involving "two groups of conspirators, two geographic areas, two time spans[.]" *Kearney*, 560 F.2d at 1363. Rather, the conspirators were united in time and space. The evidence proved the existence of the conspiracy from at least December 2011 to November 2012 (and beyond). Singh's participation spanned the entirety of the conspiracy. As early as December 25, 2011, an email from Bonnie Dumanis to her campaign staff reported that she "got a call, a conference call, from Ernie Encinas, Susumo Azano and Ravi Singh." GEX 24-1. Dumanis reported that Azano wanted Dumanis to "talk to [Singh] because he is a master of Internet campaign stuff." *Id.* Singh flew out on Christmas day to help Dumanis's effort. GEX 26-1.

Just as Singh arrived in town, straw donors were funneling Azano's money to Dumanis, as well. Dumanis herself reported from that first conference call that Azano was "helping to raise money from his family and friends." GEX 24-1. That was accurate. Wolter solicited straw donors on December 21, 2011 "to help Susu and His Father support the soon to be Mayor Bonnie Dumanis." GEX 11-1. Dozens of straw donors eventually agreed, and cut checks in the end of December and beginning of January, just as Singh began to insert himself into the campaign. See e.g., GEX 4-2 (12/21/11 donation by Abel Garcia); 6-3 (12/28/11 donation by Jose Garcia); 7-4 (12/28/11 donation by Marcel Kasmer); 8-4 (12/28/11 donation by Matthew Guillory); 9-2 (12/28/11 donation by Itzel Durazo); 10-2 (12/28/11 donation by Philippos Mikelatos); 11-2 (12/27/11 donation by Wolter); 12-1 (12/18/11 donation by Brian Duarte); 12-5 (12/28/11 donation by Ruth Long); 12-9 (12/28/11 donation by Monique

Navarette); 14-2 (1/2/12 donation by Michael Pedace); 17-23 (12/22/11 donation by Marc Chase); 17-24 (12/22/11 donation by Ruth Chase); 17-25 (12/29/11 donation by Bernie Chase); 45-2 (12/27/11 donation by Betty Hart); 46-1 (12/28/11 donation by Brent Marchioni); 46-5 (1/11/12 donation by Brandon Marchioni); 20-12 (collecting certified copies of checks from Dumanis campaign).

Around the time that Singh was billing Azano's Mexican company Broadlink $100,000 for his secret in-kind services for Bonnie Dumanis's campaign ("code name Betty Boob"), GEX 50-2, Azano enlisted Encinas to help Airsam make a straw donation of $100,000 to a Dumanis PAC. GEX 21-13. That donation eventually drew heavy media scrutiny, GEX 33-1, which Singh as a media-savvy consultant receiving substantial pay for his work on the same campaign undoubtedly saw.

Singh's work on the Filner campaign also shared "commonality of time" with the straw donations that Chase submitted for $180,000. At trial, the United States introduced evidence of a $120,000 check from South Beach Acquisitions to "San Diegans in Support of Bob Filner for Mayor, 2012," GEX 35-12 at 5, GEX 35-7; and $30,000 in a check from West Coast Acquisitions to the San Diego County Democratic Party. See, e.g., GEX 17-31. The jury heard evidence that Azano funded each of those checks. Marc Chase testified that he owned both companies. RT 8/11/16 [401] at 4:19-5:3. In September 2012, Azano personally asked Chase to make additional political contributions at a kitchen table conversation. *Id.* at 53:14-54:5. Azano "asked [Chase] to make a contribution. I said how much. He said $180,000. I asked will I be reimbursed and he said yes." *Id.* at 54:2-5. Azano quickly reimbursed Chase for the contributions, as the jurors saw in GEX 17-32.

As Chase made those straw donations, Singh supplemented support for Filner with his in-kind contributions. Singh drew up the "game plan" for project Plastic Man, see, e.g. GEX 26-16, received $97,000 and $95,000 for his work, GEX 32-4, 32-13P, 32-5, and embedded himself in Filner's campaign headquarter. Singh later boasted that

his efforts helped inspire a "decisive victory" for Filner (and the singular objective of the conspiracy).

### c. The Identity of the Participants.

Throughout the conspiracy, the "key participants" remained the same. *Fernandez*, 388 F.3d at 1226. As the Ninth Circuit has observed, "the common participation of key senior [conspiracy] members, [is] another factor supporting the conclusion of a single conspiracy in which senior members of the enterprise coordinated and managed the operations of their subordinates." *Id.* at 1227.  So here.  Azano (and Encinas) coordinated and managed the operations of all other participants.  And those participants—Singh, Chase, Cortes, and Hester—each injected Azano's money into San Diego's 2012 mayoral election in their own way—donor recruitment (Chase, Hester), fund transfer (Chase), facilitating PAC contributions (Chase, Cortes), or in-kind services (Singh).  All of these participants had the same goal: election of a San Diego Mayor in 2012 who would support Azano's development plans. "The consistency of key personnel and of method and type of operation militates against the separation of these [acts] into smaller, independent conspiracies." *Bibbero*, 749 F.2d at 587.

"Once the existence of the conspiracy is shown, evidence establishing beyond a reasonable doubt a knowing connection of the defendant with the conspiracy, even though the connection is slight, is sufficient to convict him of knowing participation in the conspiracy." *United States v. Meyers*, 847 F.2d 1408, 1413 (9th Cir.1988). A defendant may have a "slight connection" to a conspiracy even if the defendant did not know all the conspirators, did not participate in the conspiracy from its beginning or participate in all its enterprises, or otherwise know all its details. See *United States v. Reed*, 575 F.3d 900, 924 (9th Cir.2009). The government may rely on circumstantial evidence and inferences drawn from that evidence in order to prove the defendant's knowing connection to the conspiracy. See *United States v. Johnson*, 297 F.3d 845, 868–69 (9th Cir. 2002). Singh does not even challenge the sufficiency of the evidence

establishing a "slight" connection to the conspiracy. Nor could he. Singh's motion for judgment of acquittal should be denied.

## II. COUNT 3: WILLFUL VIOLATION OF FEDERAL ELECTION LAW

Singh also challenges the sufficiency of the evidence to establish that he willfully violated the election laws on three separate grounds. Mot. [631-1] at 7-10. None has merit.

First, Singh challenges the sufficiency of the evidence that he knew Azano was a prohibited foreign national. The United States introduced sufficient evidence for a rational jury to conclude that Singh knew. Among other things, the jury heard that:

- Singh was a self-professed "campaign guru" and the CEO of ElectionMall, a company that offered a suite of election-related technology for political candidates. RT 8/4/16 (Testimony of Aaron Ronsheim) at 9:1-21, 15:10-16. Among other things, he offered "cutting-edge online fundraising software" to track donations for "legal compliance." GEX 47-21 at 13. He had run ElectionMall since 2003. RT 8/4/16 (Testimony of Ronsheim) at 8:23. Singh had also been a candidate for political office in Illinois in the late 1990s. *Id.* at 8:18-20. He was therefore aware of the "one law . . . that would have impact nationwide," which is the "federal law that restricts the source of contributions . . .coming from foreign nationals." RT 7/29/16 at 8:18-24.

- Azano had a long-running relationship with Singh, which led to significant work for Singh in Mexico. Among other things, Singh's ElectionMall provided services to a Mexican Presidential candidate in 2011, which was funded by Azano. RT 8/4/16 (testimony of Ronsheim) at 16:16-24. Singh also did work for Azano's Mexican businesses. Singh traveled to Mexico with Azano. And Singh did a "SEO" (search engine optimization) project related to Azano and his companies' online presence. See, e.g., Singh

Ex. 2429. Their close personal and business relationship allowed the jury to conclude that Singh knew Azano was a foreign national.

- Singh's effort to hide the work he did on the Dumanis and Filner campaigns showed that Singh knew his activity was unlawful because Azano could not donate. Singh did not use code names for ElectionMall's projects. RT 8/4/16 (testimony of Ronsheim) at 12:25 ("No we didn't use codenames). Yet, he tried to obscure the work he was doing for Azano. He used code names. See, e.g., GEX 50-2 ("code name Betty Boob"), 26-16 ("project: Plastic Man"). He billed Azano's Mexican company, Broadlink for the work from the billing account for eSolutions R&D.[1] See, e.g., GEX 50-1, 32-4, 32-13P. And he repeatedly warned others not to openly discuss the in-kind services that ElectionMall provided for Dumanis or Filner. For example, in an email on June 1, 2012, Singh wrote regarding invoices to "Kaliman" (Azano): "This subject cannot be emailed." GEX 32-3. On June 13, 2012, Singh refused to correspond with Encinas about the "PAC" that was to be formed on Dumanis's behalf. He wrote "I am not responding to this email. Because of the legal ramifications. Please talk to me either in person." GEX 48-2. In a June 28, 2013 email about "Old invoices for Mr. A," Singh wrote "Please don't have Cynthia or anyone else send things with a code name. And then list the clients name in a email. That is stupid and dangerous for me." GEX 23-8. A rational jury could infer that Singh understood the "legal ramifications" of his work and that emailing about it was "stupid and dangerous" because he knew Azano was a foreign national and could not donate. See also RT 8/8/16 (testimony of Megan Standefer) at 13:8-10 ("Secret like on all levels. I wasn't supposed to talk about

---

[1] Those invoices contrasted with the invoices Singh submitted to the campaigns, under ElectionMall's header, addressed to campaign officials. See, e.g., GEX 47-16, 47-17.

- Singh's own words confirmed it. Megan Standefer, an employee Singh hired to work on Filner's campaign, testified about what "Mr. Singh may have told [her] about Mr. A's citizenship." RT 8/8/16 at 19:24-20:5. She testified "Um, I don't quite remember because after everything happened, I did read I had talked about it and heard stuff, so I didn't want to, I don't want to say that, I can imagine him saying it but I don't want to say with certainty that I heard before I found out what happened, that he was Mexican." In a recorded call with Encinas, Singh agreed to provide election services for a "foreign investor," who would "pay [Singh] direct just like, you know, Mister A did with you." When Encinas confirms that the donor is a "foreign national, so he doesn't wanna get involved" and proposes doing "the same thing as we did with Filner," Singh does not protest, but promises to put together a proposal. Two days later, Singh asked other ElectionMall employees for a copy of the "Plastic Man proposal," because "we have another opportunity for the same seat and the same rate." GEX AA-6.

Among other things, that evidence cumulatively supplied a sufficient basis for a rational jury to conclude that Singh willfully violated the election laws.

Second, Singh "re-raises arguments he presented to the jury in opening statements and throughout trial" to claim that the evidence was insufficient to establish that Singh was paid by Azano for his work (and therefore responsible for in-kind donations to the campaigns funded by an unlawful source). Mot. [631-3] at 9 n.1. He "acknowledges that" some evidence "undercuts his theory" that he was never paid. *Id.* It does. Meghan Standefer testified, for example, that Singh told her that "there was a lot of money involved" for his work on the Filner campaign. RT 8/8/16 (testimony of Meghan Standefer) at 10:13-17. At some point, Singh told her that the Filner project

was valued at "like 60,000 or six figures or something like that." *Id.* at 11:8-10. And Ed Clancy testified that he learned that Azano "was paying Mr. Singh and his team services for the Filner campaign." RT 31:2-3. And in a recorded call, Singh agreed to another proposal for a foreign investor, who would "pay [Singh] direct just like, you know, Mister A did with you." GEX AA-5. That testimony corroborated the financial records that established Azano's payments through Broadlink to Singh for his work on Dumanis's and Filner's campaigns. See, e.g., GEX 50-4 (Azano writing in an email "No more money, that wasn't the agmt with Ravi we will only transfer what I told him" in response to an invoice for the "betty boo project for 100l it was originally 75 but Mr Singh explained the need for the additional 25 during his last visit to San Diego and Mr A verbally agreed"); 26-14 (email from Singh to Ronsheim, asking for proposal for Filner campaign totaling 105k); 32-4 (invoice for $97,000); 26-16 (resulting Plastic Man proposal created after deposit of funds); 32-13P (invoice for $95,000); 32-6 (email asking for invoice for "95k"); 32-5 (E Solutions bank records reflecting wire transfers from Azano's Broadlink).

Finally, Singh challenges the sufficiency of the evidence establishing over $25,000 in illegal donations. Exhibit 26-16 alone refutes that claim. As Singh himself wrote, he anticipated $97,000 from Azano on "Monday." Exhibit 32-5 showed that the transfer occurred (clandestinely from Broadlink to ElectionMall). That money was "to win the race Nov. 6th, buy the data, and do the web, and show metrics in 15 days." GEX 26-16. The hard costs would include $12,000 to $15,000 for "data purchases," $15,000 for reseller commissions, $4000 for hotels, food, luggage, $1500 to pay an "assistant for content" (precisely what Standefer was paid), $1000 for a car rental, and $4500 for Miguel. That exceeded $25,000 itself. And was only a part of the records that established hundreds of thousands of dollars that Azano paid to Singh for his efforts. It worked. Singh's work "changed the dynamics of the course of the outreach on the social media through the social media efforts that they had engaged in tactics." RT 8/11/16 at 42:6-8. And Filner won. *Id.*

Singh's motion for judgment of acquittal on Count 3 should be denied.

## III. COUNTS 32 AND 37: § 1519 VIOLATIONS

Singh first challenges the § 1519 count convictions for the same reasons he filed an unsuccessful motion to dismiss. He contends that § 1519 cannot cover the omission of information in a record. But as this Court has already concluded, "Section 1519 expressly states that it is illegal if an individual 'conceals, covers up, falsifies, or makes a false entry'—the failure to report a donation qualifies as concealing and covering up the campaign contribution of a foreign national, which is illegal under Section 441e." Tent. Or. [168] at 2. Singh identifies no authority (or even new arguments) that compels a different result.

His challenge to the evidentiary sufficiency fares no better. Singh simply contends that he truthfully disclosed to the Dumanis and Filner campaigns that he was being paid by Azano. That avoids the entire objective of the conspiracy, which was to avoid reporting requirements through illicit funding arrangements. As demonstrated above, the evidence sufficiently showed that Singh and his co-conspirators caused the campaigns of Dumanis and Filner (even if some members were complicit) to file campaign records that concealed and covered up the fact that Azano paid for and funded in-kind donations of Singh's services.

A rational jury could conclude that Singh was guilty of the three charged offenses beyond a reasonable doubt. His motion for judgment of acquittal must be denied.

DATED: May 5, 2017

Respectfully submitted,

BLAIR C. PEREZ
Attorney for the United States
Acting Under 28 U.S.C. § 515

/s/ Helen H. Hong
PHILIP L.B. HALPERN
MARK W. PLETCHER
HELEN H. HONG
BILLY JOE MCLAIN
Assistant U.S. Attorneys

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>  v.<br>JOSE SUSUMO AZANO MATSURA (1),<br>  aka Mr. A.,<br>  aka Mr. Lambo,<br>RAVNEET SINGH (2),<br>  aka Ravi Singh,<br>MARCO POLO CORTES (4),<br>EDWARD SUSUMO AZANO HESTER (5),<br>  aka Susu,<br>  aka Junior, | Case No. 14CR1388-MMA<br><br>CERTIFICATE OF SERVICE |

IT IS HEREBY CERTIFIED THAT:

I, Helen H. Hong, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I have caused service of the **Opposition to Singh's Motion for Judgment of Acquittal [631-1]** on the parties by electronically filing the foregoing with the Clerk of the U.S. District Court using its ECF System, which electronically notifies them

I declare under penalty of perjury that the foregoing is true and correct. EXECUTED on May 5, 2017.

BLAIR C. PEREZ
Attorney for the United States
Acting Under 28 U.S.C. § 515

/s/ Helen H. Hong
PHILIP L.B. HALPERN
MARK W. PLETCHER
HELEN H. HONG
BILLY JOE MCLAIN
Assistant U.S. Attorneys